**FILED**

February 12, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ JU

DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| BRANDON LEE MOON | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | CIVIL ACTION NO. SA-06-CA-925-OG |
| | § | |
| JEFFREY DOVE and SAL OLIVAREZ | § | |
| in their individual capacities | § | |
| | § | |
| Defendants | § | |

**ORDER GRANTING SUMMARY JUDGMENT**

Pending before the Court is Defendants' Second Motion for Summary Judgment. Docket no. 271. Plaintiff has filed a response. Docket no. 274. The remaining two defendants, Jeffrey Dove and Sal Olivarez, seek summary judgment on the only remaining claim – a state claim for false imprisonment.[1] All other claims against all other parties have been resolved. The Court has both diversity jurisdiction and supplemental jurisdiction over the remaining state claim. *See* docket no. 225.  The Court has reviewed the record and the applicable law, and finds that Defendants' motion should be granted.

I.

Applicable standard

Summary judgment is proper when the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a);

---

[1]To be clear, all federal claims have been dismissed. There is no claim against these defendants under 42 U.S.C. §1983 for a violation of constitutional rights. The sole claim for false imprisonment is brought under state law.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails . . . to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Curtis v. Anthony*, 710 F.3d 587, 594 (5th Cir. 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

The Court must draw reasonable inferences and construe evidence in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Although the evidence is viewed in the light most favorable to the nonmoving party, a nonmovant may not rely on "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence" to create a genuine issue of material fact sufficient to survive summary judgment. *Freeman v. Tex. Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004).

II.

Elements of false imprisonment claim

Defendants assert that Plaintiff cannot meet the elements of his false imprisonment claim. Under Texas law, the elements of a false imprisonment claim are: (1) willful detention; (2) without consent; and (3) without authority of law. *Wal-Mart Stores, Inc. v. Rodriguez*, 92 S.W.3d 502, 506 (Tex. 2002); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *James v. Brown*, 637 S.W.2d 914, 918 (Tex. 1982); *Najera v. United States*, 926 F.3d 140, 144 (5th Cir 2019) (applying Texas law); *Davila v. United States*, 713 F.3d 248, 262 (5th Cir. 2013) (applying Texas law). There is no dispute that Plaintiff was arrested and detained without his consent. The  first and third elements – willful detention, without authority of law – are the focus of the analysis.

2

A.     Willful detention

The allegations against Defendant Olivarez pertain to the pre-arrest time period and the allegations against Defendant Dove pertain to the post arrest time period. Thus, the Court has analyzed the facts from that perspective.

1.     Pre-arrest

Detective Joe Villa was the lead investigator in the DM rape case which led to Plaintiff's arrest, detention, conviction, and imprisonment. Detective Villa is deceased, and was never a party to this lawsuit.

Defendant Olivarez previously investigated Moon in a completely separate, earlier burglary case. Moon was not convicted of the burglary charge and that case did not give rise to the arrest, detention, or imprisonment made the basis of Plaintiff's cause of action. Docket no. 274, Exh. 12, Olivarez deposition 8/24/07 @ 57:4-9 (Q: Okay. Going back to the Marquez case, that case actually went to trial. Is that right? A: Yes. Q: Okay. And Moon was, in fact, acquitted of that case. A: That's correct). Docket no. 274, Exh. 13, Moon deposition 9/2/2020 @ 44:12-14 (Q: Okay. The jury found you not guilty of that crime, correct? A: Correct.). The *only* involvement Olivarez had in the DM rape case was when Detective Villa showed Olivarez a composite of the suspect on April 29, 1987 and Olivarez told him that it reminded him of Brandon Moon. Docket no. 274, Exh. 12, Olivarez deposition 8/24/07 @ 56:1-57:3; 62:7-15; 63:5-10); Exh. 32, p. 653 ("I then asked Det. Villa if he had a composite of the subject and he then produced a composite. I then proceeded to view the composite and believed I recognized the subject to be a Brandon Moon"); Docket no. 111, Exh. B, Villa report 5/8/87 ("Detective Olivarez suggested that the composite of [DM's] attacker bore a resemblance to a subject named Brandon Moon"); Docket no. 111, Exh. C, Olivarez Affidavit ("On

April 29, 1987, I was in the Burglary Office talking with Detective Joe Villa and Detective Villa

showed me a composite of the subject the complaining witness in the most recent rape case [he] had

compiled. I immediately recognized the composite as being very similar to Brandon Moon and I

advised Detective Villa that Brandon Moon had a history with this department and he could find

information concerning Mr. Moon, including book-in photographs from our records system. On May

1, 1987, Detective Villa told me that the subject in the most recent rape case had identified Brandon

Moon. That was my last involvement with Mr. Moon.").

The Texas Supreme Court has recognized that "false imprisonment's first element may [ ]

be satisfied by conduct that is intended to cause one to be detained, and in fact causes the detention,

even when the actor does not participate in the detention." *Wal-Mart Stores, Inc. v. Rodriguez*, 92

S.W.3d 502, 507 (Tex. 2002). This causation standard has sometimes been referred to as

"instigation" of false imprisonment. *Id.* However, "to prove instigation a plaintiff must show that

the defendant clearly directed or requested the arrest." *Id.* Merely identifying a suspect is not enough

to hold someone liable for instigating a false imprisonment. *Id.* And providing inaccurate or

incomplete information is not enough to trigger liability. *Id.* at 510. The defendant must *knowingly*

*provide false information* for the causation requirement to be satisfied. *Id.* at 509-510.

There is no evidence that Olivarez knowingly provided false information to Detective Villa.

The evidence clearly reflects that Olivarez simply shared his  impression of the composite, which

reminded him of Brandon Moon. Any further investigation or follow up was in the hands of

Detective Villa, who took additional steps to identify the suspect before seeking an arrest warrant.

It was not until the rape victim, DM, had identified Brandon Moon in a photo lineup that Detective

Villa sought an arrest warrant. Docket no. 111, Exh. B, Villa report 5/8/87 @ p. 5 ("[DM] took the

4

photo lineup and promptly indicated to me that she recognized photo #3 and said that that was her attacker. Photo #3 that [DM] identified was that of Brandon Moon. . . . The following day, April 30th, I drew up an affidavit charging Brandon Moon with aggravated sexual assault."); Docket no. 133-21, 26, positive identification and admonishment signed by DM; Docket no. 133-27, DM signed statement 4/29/87 ("I examined the photo closely and I feel very stronly [sic] that the photo is that of the person who raped me"); Docket no. 133-22, Dove report 5/11/87 @ p. 1 ("On 05/01-87, subject MOON was arrested reference case 04-23040I based on a photo line-up identification by that complainant"); Docket no. 133-26, Villa Affidavit 4/30/87 @ p. 2 ("Affiant composed a photo lineup that included the defendant's photo and showed it to [DM]. [DM] pointed out the subject's photo, saying that she recognized it as that of the subject who raped her, and did in fact believe that the defendant is the subject who raped her.").

       2.     The arrest

       The evidence shows that neither Olivarez nor Dove requested, directed, or participated in Plaintiff's arrest in the case which resulted in his imprisonment. Docket no. 274, p. 569, Dove deposition 6/16/20 @ 25:19-26:3 (Q: Now, after Detective Villa conducted the photo lineup, he eventually got an arrest warrant; is that correct? A: Correct. Q: And did you see the arrest warrant? A: No, not until afterwards. Q: But he explained the basis of the warrant to you, correct? A: Afterwards. I – I had no knowledge he was going to make an arrest on this at that time); 26:22-23 (A: No. The day that he executed the arrest warrant, I had taken a day off. I was not at work); Docket no. 274, p. 283, deposition of Brandon Moon 9/2/20 @ 66:24-67:6 (Q: How did you find out that you were under investigation for the sexual assault of [DM]? A: Sometime around 3 o'clock in the morning, I received a knock on my door in the dorms and I was placed under arrest. Q: Do you know

the names of the arresting officer? A: I do not.); Docket no. 274, p. 363, deposition of Sal Olivarez, 6/16/20 @ 5:1-2 (A: Well, I wasn't involved in that investigation, period.); Docket no. 274, Exh. 25, p. 535, Affidavit of J. Dove 8/15/07 ("Detective Villa told me that based upon his investigation to date he was going to prepare an Arrest Complaint Affidavit to see if a Judge would sign it and issue an arrest warrant for Brandon Moon."); Docket no. 274, Det. Joe Villa report 5/8/87, p. 498 ("The following day, April 30th, I drew up an affidavit charging Brandon Moon with aggravated sexual assault. I presented the affidavit to municipal court judge, Ricardo Herrera, and he issued warrant #M87-05895.); p. 500 ("At 0145 Hrs., May 1st, the police dispatcher called me at home and informed that Moon had just showed up at his dormitory. I went to my office and prepared a search warrant to search Moon's room. I attempted to contact several District and County Court judges to get the search warrant signed, but I met with negative results. I decided to proceed to UTEP and arrest subject Moon and to secure the search warrant later. At the UTEP Police Office, I met with Sgt. Aguirre and Officer Carol Davis. I turned the warrant over to them and accompanied the [sic] to Moon's dormitory, Barry Hall, R. 905B. At 4:10 am, we entered Moons room and placed him under arrest. We found Moon in the room by himself and Officer Davis advised him of his constitutional rights. . . . El Paso Police Unit 234, officers Candice Cusac and George Garza arrived and assisted me in transporting Moon to Central Police Headquarters. Upon arriving at Central judge Andrew Baka warned Moon of his Miranda rights."); Docket no. 139, Exh. T, Certificate of Magistrate, dated 5/1/87, signed by Andrew Baka; Docket no. 274, p. 595, Dove deposition 6/16/20 @ 51:7-10 (Q: And it's my understanding that Detective Villa arrested Brandon Moon with two other officers who worked at the university. Do you recall that? A: I've read it.); Docket no. 111, p. 38, Exh. D, Dove Affidavit ("On Friday, May 1, 1987, I was advised by Detective Joe Villa that

Brandon Lee Moon had been arrested and taken into custody"). Defendants cannot be held liable for an arrest in which they had no personal involvement.

      3.      Post arrest detention

Detective Villa was the lead investigator in the DM rape case; however, Defendant Dove became aware of the DM case because he was the lead investigator in another sexual assault (the KN case) that occurred earlier but under similar circumstances. There was also a third case, the MD rape case, that appeared to have similarities. Each case had a different lead investigator, but the similarities between the cases led the investigators to believe the cases were related. Docket no. 274, p. 411, Dove deposition 9/7/07 @ 27:24-28:20 (Q: And, in fact, at one point in time, I believe in one of your affidavits, you said, as a result of similarities in the composites, this is one of the reasons that Brandon Moon was arrested. Isn't that right? A: That's one of the reasons, yes, sir. Q: Okay. And the other reason that you set down, either in your report or in your affidavit, is because of the modus operandi of various incidents that occurred from 1985 to 1987; is that right? A: That is correct. Q: Okay. And the modus operandi being the ski mask, terroristic threats, use of a gun, basically, and – and other things? A: And other things, yes. Q: And that would indicate to you, as a law enforcement officer, that the person that did one did all of those; is that right? A: Yes. Q: Okay. And you're still of that belief here today? A: Yes, I am.); Docket no. 274 pp. 588-591, Dove deposition 6/16/20 @ 44:24-45:10; 46:22-47:6 (the incidents occurred in the same geographic area).

The police department arranged a physical lineup on the day after Moon's arrest and called all three victims (DM, KN, and MD) to come down to the office to view the lineup. Defendant Dove was one of the investigators involved in coordinating the physical lineup. Dove picked up Moon from the jail and transported him to the office. Docket no. 274, p. 417, Dove deposition 7/7/07 @

52:17-25. They searched for other participants to stand in the physical lineup, but they did not have enough Caucasian detainees with similar characteristics so he selected four officers to participate in the lineup. Docket no. 274, p. 418, Dove deposition 7/7/07 @ 53:1-19; 112:20-113:10 (Q: On Saturday, May the 2nd, 1987, did you have any difficulty finding white Anglo males in the El Paso County jail? A: Yes, sir, I did. Q: Were you able to find any that were the same size, build, complexion, hairstyle as Brandon Lee Moon? A: No sir. Q: And why did you use four El Paso Police Department officers? A: So I could put together a physical lineup. I used them because I – I couldn't find anybody else to stand in. Q: And did you select those people based on your belief that they had – that they were the same height, weight, same general physical characteristics? A: Yes.); Docket 274, Exh. 31, Dove report 5/2/87 ("All are white males, of the same approximate age, all have short brown hair, and all are clean shaven. The [ ] line-up participats were instructed to change into jail blues, identical to the clothing subject Moon was now wearing"); Docket no. 274, p. 502, Villa report 5/8/87 ("On Saturday at 0800 Hrs., Det. Dove and I met at the CAP offices and started working to put the lineup together. We decided to conduct the lineup at the CAP office and at 0950 Hrs. Det Dove picked up Brandon Moon at the County Jail and escorted him to the CAP office. We got Mike Gill, Wesley Rappe, Greg Brickey, and Tracy Pace to stand in the lineup with Moon. These persons were picked to stand in the lineup because of their similar general characteristics. Each one was given the same type blue, jail orderly uniforms. We instructed the participants to remove their shoes and stand in the lineup barefooted. We also advised them of the procedure that we would use."). Plaintiff now alleges that the manner in which participants were selected violated EPPD policy, which stated that the "Arrangement of Lineup" is "Five or six inmates of the County Jail, to include the subject." Docket no. 274, Exh. 24. However, the policy also stated "Inmates should be

8

the same approximate size, nationality, and general appearance of the subject." *Id.* There is simply

no evidence that this procedure resulted in a suggestive lineup. Instead, the evidence supports just

the opposite. Plaintiff admitted there was nothing suggestive about the lineup. Docket no. 274, p.

296, Moon deposition 9/2/20 @ 80:18-81:9 (Q: At that time, were you clean-cut? And by that, I just

mean shaven. A: Yes. Yes. Q: And your haircut, was – was it long hair or short? A: It was military

short. Q: Okay, and when you say these officers were clean-cut, they also had short hair and shaven?

A: Yeah, as I remember. Q: Okay. Let me just stick to the physical appearance. Was there anything

just about their physical appearance that was significantly different than your physical appearance?

A: not that I can recall, no. Q: Do you remember if they were all generally the same height as you?

A: Fairly so. I believe so.); 82:12-16 (Q: Okay. Did you say anything to the officer there in charge

about that? A: Yes, I did, actually. After – after the lineup, I said something to the effect, Well, at

least they all kind of looked like me.); 83:1-6 (Q: If we looked at the picture of the five of you, what

I understand you to be telling us is there's no obvious physical characteristics that would identify any

of the five as police officers; is that true? A: I couldn't say that, no. I – I could not pinpoint any

identifying characteristics of such); 83:18-20 (There was nothing physical that said that these people

were police officers, as far as I'm – as far as I can recall); 83:21-84:9 (Q: Okay. Let me ask you this:

Was there anything that you recall about the way they stood, faced forward, turned to the side or put

their hat on that you believe would identify to someone that those were police officers? A: Not

specifically. I can't say anything. Q: I mean, do you remember them doing any of those things

differently than the way you did? A: No, I can't say that they did. Q: Do you remember any – any

behavior on their part during the lineup that you thought was an effort to signal to whoever was

watching that they were – any of them was an officer? A: I don't recall anything like that.); 85:14-19

(Q: However the instruction were communicated, whether by an officer – A: Uh-huh. Q: – or a speaker, was there anything about that that you thought suggested that you were the suspect? A: No.); 86:10-19 (Q: Whoever the officer was that escorted you into the lineup and back to your cell, do you remember any specific discussion with that officer? A: No – well, just the one that I mentioned, that I said, At least they looked like me this time. Q: Right. Is there – did that officer behave in any way improperly or unprofessionally during the lineup process? A: Not that I'm aware of. Not that [was] brought [to] my attention.); 92:21-93:2 (Q: And again, just to make sure that we're clear, assuming it was Detective Dove that was involved in the lineup procedure, do you remember any discussion with him on the trip to the hospital or during the lineup procedure that struck you as dishonest, biased, unprofessional, or otherwise, you know, somehow sinister? A: No.).

Plaintiff also complains that the victims were allowed in the same hallway prior to being led separately into the observation room. Without evidence, Plaintiff alleges that this also caused an improper identification process. Importantly, Detective Villa and Lieutenant Saucedo[2] – not Defendant Dove – were responsible for handling the witnesses. Defendant Dove was in a separate room, on the opposite side of the one-way glass, handling the participants in the lineup. He was neither involved in nor had any knowledge of the manner in which the witnesses were being handled in the hallway or the observation room. Docket no. 274, Exh. 25, Dove Affidavit p. 5 ("My part in the lineup procedure was that I was in the room with the lineup participants, standing by the door so I could give instructions to the individuals in the lineup"); Docket no. 274, p. 418, Dove deposition 9/7/07 @ 56:6-12 (Q: Where were all the victims/witnesses placed before the lineup? A:

---

[2]Lieutenant Saucedo has never been a party to this lawsuit. Defendant Olivarez was not involved in the lineup process. Docket no. 274, Exh. 12, Olivarez deposition 8/24/07 @ 69:6-9.

I don't know. Q: Okay. Did anybody ever tell you that they were all in the same room. A: I later found out that they were in the hallway.); 64:20-25 (Q: Okay. After the three individuals that we talked about earlier, that being [MD, KN, and DM], after they left the room, did they then – did you see where they went after they left the lineup room? A: No, sir.); 106:14-20 (A: At the time, I was in another room, so I couldn't see who actually was outside the interview room. Q: Where exactly were you at during the – the live lineup? A: I was inside the video room with the lineup participants.).

Detective Villa stated, in his report, that when the witnesses arrived, he instructed each of them not to discuss anything pertaining the matter with each other. The witnesses sat on a bench in the hallway, and he stayed with them until he was told that everything was ready. He then escorted each witness separately and individually into the viewing room while Lieutenant Saucedo stood by the doorway. Docket no. 274, pp. 502-506, Villa report 5/8/87. Lt. Saucedo also signed a statement on May 8, 1987, and verified that each of the victims separately viewed and identified Moon, and his description of the process was consistent with that of Detective Villa. Docket no. 133-23. In his affidavit, Lt. Saucedo further explained: "I clearly knew and understood that on May 2, 1987, when numerous witnesses were to view a physical line-up, the witnesses were to be segregated and to have no contact with each other prior to or after viewing any live line-up. That was the policy, custom, procedure and practice of the Crimes Against Persons Bureau at the time of these line-ups referred to this in affidavit. When the three complaining witnesses were brought to the Crimes Against Persons division offices, they were mistakenly placed together in the hallway outside the viewing room. However, these three women [KN, MD, and DM] did not talk to each other and more importantly, each made an individual and separate viewing of the physical line-up. These women

had no contact with each other after each made an individual and separate identification of Brandon Moon." Docket no. 111, Exh. E. The record is devoid of any evidence to support Plaintiff's allegation that the physical lineup was suggestive or tainted, and that any impropriety in the lineup process caused his detention.

       B.     Without authority of law

Defendants further assert that there is no evidence that Plaintiff was arrested and detained without authority of law. Thus, Plaintiff cannot prove the third element of his claim. If the arrest and detention in question were performed with the authority of law, no false imprisonment occurred. *Wal-Mart Stores, Inc. v. Resendez*, 962 S.W.2d 539, 540 (Tex. 1998) (citing *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985)). In other words, "[i]f an arrest or detention is executed under process which is legally sufficient in form and duly issued by a court of competent jurisdiction—where an arrest is made pursuant to a valid arrest warrant, for example—there is no cause of action for false imprisonment." *Martinez v. English*, 267 S.W.3d 521, 529 (Tex. App. – Austin 2008, pet. denied) (citing *James*, 637 S.W.2d at 918). A facially valid warrant precludes a claim of false imprisonment "even if the events that led to its issuance were 'irregular, or void, or that the court did not have jurisdiction of the person of the defendant.'" *Najera*, 926 F.3d at 144-45 (quoting *Pate v. Stevens*, 257 S.W.2d 763, 767 (Tex. Civ. App. – Texarkana 1953, writ dism'd)).

The undisputed evidence in the record shows that Plaintiff was arrested pursuant to a valid legal process by a court of competent jurisdiction. As Detective Villa explained in his report, "I drew up an affidavit charging Brandon Moon with aggravated sexual assault. I presented the affidavit to municipal court judge, Ricardo Herrera, and he issued warrant #M87-05895 . . . At the UTEP Police Office I met with Sgt. Aguirre and Officer Carol Davis. I turned the warrant over to them and

12

accompanied [them] to Moon's dormitory, Barry Hall, R., 905B. At 4:10 am, we entered Moons room and placed him under arrest. We found Moon in the room by himself and Officer Davis advised him of his constitutional rights." Docket no. 274, pp. 498, 500 (Villa report 5/8/87). Plaintiff asserts that Defendants haven't included the actual warrant in the record; thus, they haven't shown the warrant was valid. However, this is a civil case and it is not Defendants' burden to prove authority existed. Instead, it is Plaintiff's burden to prove the *absence* of authority in order to establish the third element of his false imprisonment cause of action. *Sears, Roebuck & Co. Castillo*, 693 S.W.2d 374, 376 (Tex. 1985) ("The plaintiff must prove the absence of authority in order to establish the third element  of a false imprisonment cause of action"). The evidence in the record leads to only one conclusion – that Defendants were acting with the authority of law. "[A]n officer acting with the authority of law does not commit false imprisonment." *Davila*, 713 F.3d at 262. Plaintiff has not met his burden to show an absence of authority to establish the third element of a false imprisonment claim.

        C.      Broken causal link

Defendants also assert that they cannot, as a matter of law, be held individually liable for Plaintiff's 17 year imprisonment because there is an absence of causation or, in the alternative, the chain of causation was broken. As explained *supra*, there is no "instigation causation" because there is no evidence that Olivarez knowingly provided false information when he commented on the composite sketch. Nor is there any evidence that Dove put together a suggestive lineup and that his conduct caused Moon's detention. However, even if evidence of causation existed, there are several intervening causes that broke the causal link. *Mayfield v. Currie*, 976 F.3d 482, 486 (5th Cir. 2020) ("It is well settled that if facts supporting an arrest are placed before an independent intermediary

such as a magistrate or grand jury, the intermediary's decision breaks the change of causation for false arrest, insulating the initiating party." (quoting *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009)). The evidence in this case clearly reflects that facts supporting an arrest were placed before independent intermediaries – a magistrate, a grand jury, and a petit jury, which breaks the chain of causation in this case. Docket no. 274, p. 498, Villa report ("I presented the affidavit to municipal court judge, Ricardo Harrera, and he issued warrant #M87-05895."); Docket no. 274, Exh. 25, Dove Affidavit, p. 8 (nine indictments were returned against Brandon Lee Moon); Docket no. 139, Exh. V, Grand jury indictment against Brandon Moon in the DM case; *see also* Docket no. 274, Exh. X, Trial transcript @ Vol II, 119:7-13 (in court identification of Moon by DM during trial on the merits).                                  III.

## Official immunity

Under these facts, and because Defendants Dove and Olivarez are being sued in their individual capacity, they are also entitled to official immunity. Under state law, government employees are entitled to official immunity from suit arising from performance of their discretionary duties, in good faith, as long as they are acting within the scope of their authority. *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994); *Ballantyne v. Champion Builders, Inc.*, 144 S.W.3d 417, 424 (Tex. 2004); *Murray v. Earle*, 405 F.3d 278, 294 (5th Cir. 2005 (applying Texas law). This doctrine provides true immunity from suit, and not a simple defense to liability. *Murray*, 405 F.3d at 294. First, both Olivarez and Dove were performing discretionary functions at the time of their limited involvement in the DM rape case. "A discretionary function – as distinguished from a ministerial duty, which requires rote obedience to orders or performance of a function to which the actor has no choice – involves personal deliberation, decision and judgment." *Id.* Olivarez was using

14

his judgment when he weighed in on Moon's resemblance to the composite and Dove was using his judgment when he organized the physical lineup. Second, "[a]n officer acts in good faith if a reasonably prudent officer, under the same circumstances, could have believed that his actions were correct." *Id.* The evidence shows that Olivarez acted in good faith when he opined that the composite reminded him of Moon. The evidence also shows that Dove acted in good faith when he organized a physical lineup that was *not* suggestive or biased. And finally, "an officer acts within the scope of his authority when he discharges the duties generally assigned to him." *Id.* . Both Olivarez and Dove were acting within the scope of their authority as investigators for the police department at the time of the events complained of herein.

For these reasons, Defendants' Second Motion for Summary Judgment (docket no. 271) must be GRANTED, and Plaintiff's false imprisonment claim must be DISMISSED with prejudice. Final judgment may be entered accordingly, with taxable costs assessed against Plaintiff. This case may be closed.

IT IS SO ORDERED this __12__ day of February, 2021.

_____
ORLANDO L. GARCIA
CHIEF U.S. DISTRICT JUDGE